**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **OSBALDO JOSE-NICOLAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 20 C 5507** |
| | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| **DR. JOHN TROST, DR. STEPHEN** | ) | |
| **RITZ, and DR. MOHAMMAD SIDDIQUE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Plaintiff Osbaldo Jose-Nicolas has filed suit against Wexford Health Sources,

Inc., Dr. John Trost, Dr. Stephen Ritz, and Dr. Mohammad Siddique, asserting claims of

deliberate indifference in violation of the Eighth Amendment, intentional infliction of

emotional distress, negligence, willful and wanton negligence, and negligent infliction of

emotional distress. The defendants have moved for summary judgment on all of Jose-

Nicolas's claims, and Jose-Nicolas has moved for summary judgment on his claims of

negligence and negligent infliction of emotional distress. For the reasons below, the

Court grants summary judgment in favor of the defendants on Jose-Nicolas's intentional

infliction of emotional distress claim and otherwise denies the cross motions for

summary judgment. The Court also denies Jose-Nicolas's motion seeking oral

argument, having concluded that the parties' written submissions are sufficient.

**Background**

The following facts are undisputed unless otherwise noted.  Jose-Nicolas is serving a forty-five-year prison sentence and has been in the custody of the Illinois Department of Corrections (IDOC) since 2008.  He is 38 years of age.  Jose-Nicolas was incarcerated at Menard Correctional Center from 2008 to 2019, Stateville Correctional Center from 2019 to 2021, and at Hill Correctional Center from 2021 to the present.

Wexford Health Sources, Inc. is a Pennsylvania-based corporation that provides medical services to IDOC prisons. Under its contract with IDOC, Wexford was the healthcare provider at Menard and Stateville Correctional Centers from 2013 through 2020.  Drs. Trost, Siddiqui, and Ritz were or are employees of Wexford.  Dr. Trost was employed as the Medical Director at Menard from November 2013 until his termination in March 2017.  Dr. Siddiqui began his employment with Wexford in 2016.  He took over as Menard's Medical Director following the termination of Dr. Trost in 2017 and served in that role until he too was terminated in August 2021.  Dr. Ritz has been employed by Wexford in various roles, including as the State Utilization Management Medical Director, and Corporate Utilization Management Medical Director, since 2014.  He currently serves as the Chief Medical Officer and has done so since July 2020.  Dr. Ritz is based in Wexford's corporate office in Pittsburgh, Pennsylvania.

When an inmate at IDOC prisons feels they need medical attention, they can put in a request for a sick call.  That request is triaged, and the inmate is typically seen by a nurse or similar provider within twenty-four hours.  If a provider decides a patient would benefit from an off-site medical service or certain specialized onsite medical services,

the provider places a request to Wexford's utilization management department for a "collegial review" of the proposed service. The provider does so by filling out a referral request form, which includes an explanation of the service and provider being requested. The Site Medical Director reviews these forms, and if the Director determines that a referral is a viable next step, they submit the form to utilization management department in Pittsburgh for a collegial review phone call.

Collegial review is a phone call between a Site Medical Director and the Utilization Management Director to discuss a referral. The calls generally with occur with each prison on a weekly basis. The participating physicians receive and are expected to have reviewed in advance of the call supporting documentation like a patient's medical records, lab work, and current medications. If the referral request is not agreed to in collegial review, the form is stamped "Non-Approved," a Non-Approval/Appeal form is sent to the site, and the reviewing physicians create an alternate treatment plan.

In December 2015, Jose-Nicolas visited the Menard infirmary complaining of abdominal pain that he had been experiencing for about a year. The examining provider noted that antacids should be considered and provided Jose-Nicolas with a "patient teaching" that included directions to eat properly, drink plenty of fluids, and to avoid fatty and snack foods as well as NSAID pain relievers for three days. Jose-Nicolas returned to the Menard infirmary on March 20, 2016. He reported "mid-chest pain" that was an eight out of ten in intensity and sometimes related to food intake. The examining nurse advised him to remain upright after meals and to avoid overeating, eating rapidly, and eating three to four hours before bed. The nurse also prescribed him

antacid tablets and Zantac, which reduces acid production.  Jose-Nicolas returned to the infirmary on April 9, 2016, reporting symptoms of burning and cramping abdominal pain.  The examining provider referred him to a physician for examination.

On April 13, 2016, Jose-Nicolas was seen by Dr. Trost for his abdominal pain. Dr. Trost prescribed Jose-Nicolas a medication, Prilosec, to reduce acid production and ordered a stool and blood test to check for heliobacter pylori (H. Pylori).  Jose-Nicolas's stool sample came back positive for H. Pylori.  Dr. Trost ordered medication to treat it and followed up with Jose-Nicolas on May 11, 2016.  He prescribed Jose-Nicolas Prilosec again.

On October 4, 2016, Jose-Nicolas returned the Menard infirmary complaining of burning pain in his abdomen, which he rated a nine out of ten in intensity.  He reported that the pain occurred all the time, not only when he ate, and that although he was taking his Prilosec, it did not help.  He returned again on October 30 with pain in the mid upper abdomen, which he rated between an eight or nine out of ten in intensity. The examining provider noted that Jose-Nicolas had pain that persisted despite treatment protocol implementation.  They prescribed him Pepcid for three days, provided a "patient teaching" similar to those administered before, and referred him to a physician for examination again.

On November 3, 2016, Jose-Nicolas was examined by a nurse practitioner, Lisa Tindall.  He reported that his abdominal pain was in the mid sternum area and that he experienced nausea and vomiting twice per week.  During the physical examination, Nurse Tindall noted that Jose-Nicolas's mid-epigastric area was tender.  She put a hold on Jose-Nicolas's Prilosec prescription for two weeks and prescribed him Zantac, Pepto

4

Chew tabs and amoxicillin.

Jose-Nicolas filed his first of three related grievances with IDOC concerning his medical care on December 13, 2016.  He claimed that he was suffering from extreme pain that kept him from sleeping or walking, was vomiting two to three times a week, and he requested to see an outside physician for treatment.

He returned to the infirmary again on December 15, reporting stabbing abdominal pains and that he had vomited six times that morning.  Jose-Nicolas was examined by Nurse Tindall that day, and she recorded his complaints of sharp, mid-epigastric abdominal pain that "radiate[d] to the right side."  When Nurse Tindall conducted a physical exam, she documented tenderness over a spot on the lower right quadrant of Jose-Nicolas's abdomen.  She prescribed Jose-Nicolas additional medications, including Biaxin, Prilosec, Flagyl, and an antibiotic, and she ordered a bladder x-ray and a series of metabolic laboratory tests, the results of all ended up being "within normal limits."  Jose-Nicolas sought treatment twice more in December and reported some improvement since starting antibiotics.

Jose-Nicolas saw Nurse Tindall again on January 4, 2017.  She reported that he continued to experience pain on the right side of his abdomen and that, during a physical exam, he had tenderness over both the right upper and lower quadrants of his abdomen.  Nurse Tindall also submitted IDOC Medical Special Services Referral and Report form referring Jose-Nicolas for a gallbladder ultrasound.

Drs. Trost and Ritz discussed and denied Nurse Tindall's referral for an ultrasound in collegial review on January 13, 2017.  They had access to and reviewed Jose-Nicolas's medical records.  Their discussed Jose-Nicolas's symptoms included

reports of mid-epigastric and/or mid-sternal abdomen pain as well as right upper quadrant pain, that his white blood cell, lipase, and amylase levels were within normal ranges, that he had nausea and was vomiting daily, and that he had a history of H. Pylori, but his symptoms were unchanged after treatment. The Offender Outpatient Progress Notes state that outcome was "[r]eferral denied," and Dr. Ritz "ATP'd this case for additional information and discussion." Pl.'s Ex. FFF.

Jose-Nicolas returned to the Menard infirmary on February 16, 2017 complaining of nausea, burning and cramping abdominal pain, and right sided chest pain that was worse after eating. The provider he saw advised him to eat properly and drink plenty of fluids, avoid NSAIDS as well as snack and fatty foods for three days, and to return if symptoms worsened or persisted.

On February 20, 2017, Jose-Nicolas filed his second related grievance, in which he reported his severe ongoing pain and the denial of his ultrasound. He received a response from a Health Care Unit Administrator at Menard on February 23 stating that his case would be re-discussed in collegial review as soon as possible and that he was scheduled to see the doctor on February 27, 2017. If he had further problems, he was instructed to "follow procedure and put in for a sick call."

Jose-Nicolas returned to the infirmary as scheduled on February 27 and complained of abdominal pain in the lower right quadrant. There is no record of treatment, other than to "recall" the patient, presumably meaning to have him return at a later point. Pl.'s Ex. JJJ.

On March 13, 2017, Drs. Trost and Ritz again discussed but did not authorize Jose-Nicolas's gallbladder ultrasound referral at collegial review. They instead made an

alternate treatment plan "to provide teaching about diet and eliminate dietary offending agents, monitor onsite, track weight loss/gain, and make [sic] PPI administered under direct observation.  Represent if symptoms worsen."  Pl.'s Ex. LLL.

Wexford terminated Dr. Trost's employment shortly after this (there is no indication this was related in any way to Jose-Nicolas).  On May 8, 2017, his replacement, Dr. Siddiqui, signed Medical Special Service Referral Denial or Revision form, which confirmed that Jose-Nicolas's "case was re-discussed in collegial by Dr. Trost for an on-site gall bladder ultrasound," and that "Dr. Ritz, Wexford UM, had denied [the] referral."  Pl.'s Ex. MMM.

On May 15, 2017, Jose-Nicolas returned to the Menard infirmary and was seen by Dr. Siddiqui.  Jose-Nicolas complained of chronic right upper quadrant abdominal pain that had lasted for approximately two years.  Dr. Siddiqui conducted a physical exam looking for signs of acute infection or inflammation and found none.  He noted that the ultrasound was rejected at collegial review and issued a renewed prescription for Prilosec.  This is the only time Dr. Siddiqui physically treated Jose-Nicolas.

On July 12, 2017, Jose-Nicolas filed his third Offender's Grievance with IDOC restating his symptoms and again requesting the denied ultrasound.

On July 23, 2017 Jose-Nicolas returned to the Menard infirmary complaining of knife-like abdominal pain, nausea, constipation, and reported shortness of breath and blood in his stool.  Jose-Nicolas reported tenderness when the examining provider palpated his abdomen, and the provider referred him to a physician with a note to consider an ER referral.  On July 26, Jose-Nicolas saw non-defendant Dr. Shah, who prescribed Prilosec and Bentyl and ordered a series of lab tests.  The tests conducted

7

included another H. Pylori test.

On August 11, 2017, Dr. Siddiqui signed a response to Jose-Nicolas's third grievance, in which he restated Jose-Nicolas's treatment history, including that tests had been ordered and that he was supposed to have a follow-up in three weeks. If Jose-Nicolas had further issues, he was to follow procedure and put in for a sick call.

Jose-Nicolas visited the infirmary again on September 6, 2017, where he discussed that his lab result were normal and he was again negative for H. Pylori. Jose-Nicolas reported his bowel movements were normal and he was feeling better.

Jose-Nicolas returned the infirmary on February 28, 2018, and was seen by Dr. Shah who prescribed Zocor, a cholesterol medication. There are no medical records of abdominal complaints by Jose-Nicolas from September 2017 to April 2019, though he continued to be treated by Dr. Siddiqui and Dr. Ritz for other conditions. Jose-Nicolas testified that he continued to complain of abdominal pain during this time.

Jose-Nicolas was transferred to Stateville on February 27, 2019. He visited the Stateville infirmary on April 26, 2019, complaining of right-sided abdominal pain for the preceding two years. The examining nurse referred Jose-Nicolas to a physician and told him to eat properly, drink fluids, and avoid NSAIDs, fatty and snack foods for three days.

On May 7, 2019, Jose-Nicolas saw a physician's assistant at Stateville, reporting his nausea and abdominal pain. The physician's assistant prescribed him Bentyl, ordered a bladder x-ray, suggested a bland diet, and planned to discuss the case with the medical director.

On May 9, Dr. Henze, a medical director at Stateville, referred Jose-Nicolas to

collegial review seeking approval for an abdominal ultrasound. On May 21, Dr. Henze discussed the referral at collegial review with Dr. Garcia, another Wexford collegial review physician. They approved the ultrasound.

The abdominal ultrasound was performed on June 5, 2019. The report showed that Jose-Nicolas had gallbladder wall thickening and had structures consistent with cholelithiasis (gallstones). Jose-Nicolas discussed the results with a physicians assistant on June 11. On June 18, 2019, Dr. Henze referred Jose-Nicolas for a off-site general surgery evaluation, the rationale being that he had cholelithiasis and cholecystitis. This referral was approved in collegial review on June 25, 2019. Jose-Nicolas consulted with a general surgeon on October 14, 2019 and relayed the symptoms he experienced over the preceding four-plus years.

On November 14, 2019, after Dr. Henze's referral and Wexford's approval, Jose-Nicolas had his gallbladder removed.

Jose-Nicolas has also received treatment for mental health issues while incarcerated, and his records reflect a historical diagnosis of PTSD and a prior suicide attempt. He testified that at times he thought he was going to die because of the pain he experienced.

Jose-Nicolas filed suit against Wexford, Dr. Trost, Dr. Ritz, and Dr. Siddiqui on January 7, 2020, and he filed an amended complaint on August 30, 2021, after receiving Court-appointed counsel. He alleges that the defendants' failure to administer an abdominal ultrasound caused him to continue to experience severe abdominal pain and functional impairment that he would not have experienced if adequate medical care had been provided. Jose-Nicolas asserts claims of deliberate indifference in violation of

the Eighth Amendment, intentional infliction of emotional distress, negligence, willful and wanton negligence, and negligent infliction of emotional distress against the defendants. The defendants have moved for summary judgment on all of Jose-Nicolas's claims. Jose-Nicolas filed a cross motion for summary judgment on his negligence and negligent infliction of emotional distress claims.

The parties have agreed to bifurcate Jose-Nicolas's *Monell* claim against Wexford, and accordingly, the Court does not consider it in deciding the current motions.

**Discussion**

To prevail on a motion for summary judgment, the moving party must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which "might affect the outcome of the suit," and a dispute of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020).

The parties both raise preliminary arguments that the Court will address first. The defendants argue that opinions of Jose-Nicolas's expert in the case, Dr. Roth, should be stricken as based on insufficient facts or data because he did not read the deposition transcripts of the defendant physicians. The Court is unpersuaded by this argument. Jose-Nicolas correctly points out that there is no requirement that an expert

10

review all the records available in the case. Rather, the testimony must be "based on sufficient facts or data." Fed. R. Evid. 702(2). In rendering his opinion, Dr. Roth reviewed the same underlying medical records that the defendants reviewed or had access to when they determined what care Jose-Nicolas would receive. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). To the extent the defendants believe there are shortcomings in the documents Dr. Roth reviewed or concerns that he has not personally treated GERD, these issues are appropriately explored through cross examination.

For his part, Jose-Nicolas contends that the defendants' motion should be denied because their Local Rule 56.1 statement of material facts contains legal arguments, in violation of Local Rule 56.1(d)(4). It is true that "[r]eference to legal arguments to support a denial of a material fact is not contemplated by the rule," and the Court has discretion to require strict compliance with the requirements of Rule 56.1. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). But even if the defendants have included legal arguments in their Rule 56.1 Statement, the Court is not inclined to deny their motion on that basis. The substantive grounds described below are sufficient.

## A. Deliberate indifference claim

The Eighth Amendment's prohibition on cruel and unusual punishment "requires that the government provide 'medical care for those whom it is punishing by incarceration.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Estelle v.*

11

*Gamble*, 429 U.S. 97, 103 (1976)).  Though not every denial of medical treatment

violates the Eighth Amendment, the law prohibits a lack of care that "may result in pain

and suffering which no one suggest would serve any penological purpose."  *Id.* (quoting

*Gamble*, 429 U.S. at 103).  This prohibition includes "deliberate indifference to serious

medical needs" of a prisoner.  *Id.* (quoting *Gamble*, 429 U.S. at 104).

      Courts conduct a two-step analysis to determine whether the Eighth Amendment

has been violated in this context, asking (1) "whether a plaintiff suffered from an

objectively serious medical condition, "and (2) if the "individual defendant was

deliberately indifferent to that condition."  *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir.

2016).

      The defendants do not dispute that Jose-Nicolas suffered from an objectively

serious medical condition.  Rather, they seek summary judgment on the basis that

Jose-Nicolas has not established that the doctors were deliberately indifferent to him.

To establish deliberate indifference, a plaintiff must provide evidence that the official

knew of and disregarded a substantial risk of harm.  *Id.*

      Assessing deliberate indifference requires looking "at the totality of an inmate's

medical care when considering whether that care evidences deliberate indifference to

serious medical needs."  *Id.* at 728.  "[A]n inmate is not required to show that he was

literally ignored by prison staff to demonstrate deliberate indifference."  *Id.*  "[W]hether a

prison official had the requisite knowledge of a substantial risk is a fact question that

could be demonstrated by drawing an inference from circumstantial evidence."  *Walker

v. Peters*, 233 F.3d 494, 498 (7th Cir. 2000).  "If a risk from a particular course of

medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison

12

official knew about it and disregarded it." *Petties*, 836 F.3d at 729.

As the movants, the defendants bear the burden of showing there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In this case, to succeed on summary judgment they must show that there is no evidence from which a reasonable jury could find that they knew of and disregarded a substantial risk to Jose-Nicolas. They can meet this burden by presenting specific evidence or by pointing out "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Then the non-moving party must respond with "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018).

In support of their motion, the defendants contend that there is no evidence that Drs. Siddiqui, Trost and Ritz knew of an "imminent danger" to Jose-Nicolas.[1] They state that on the occasions where Dr. Siddiqui and Dr. Trost examined Jose-Nicolas, he had no reproducible pain, was refusing to take his GERD medication, and there were no signs that he was in distress. As to Dr. Ritz, the defendants note that he never examined Jose-Nicolas in person and only participated in two collegial review calls that reflected the observations about Jose-Nicolas described above.

In arguing against summary judgment, Jose-Nicolas contends that the

---

[1] Neither the Seventh Circuit nor the Supreme Court have established that an inmate must have been in "imminent danger." Indeed, "the Eighth Amendment 'protects [an inmate] not only from deliberate indifference to his or her current serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health.'" *Elyea*, 631 F.3d at 858 (quoting *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005) (emphasis in original)).

defendants "persisted in a course of treatment known to be ineffective," Pl.'s Motion at
11 (quoting *Petties*, 836 F.3d at 729-30), chose a less efficacious treatment without
exercising professional judgment, *id.* at 12, inexplicably delayed his treatment, and
failed to follow existing protocol, *id.* at 12-13.

Each of Jose-Nicolas's contentions, if well founded, has been recognized as by
the Seventh Circuit as evidence of deliberate indifference. And, in this case, each is the
subject of material factual disputes which make this claim inappropriate for summary
judgment.

Jose-Nicolas's contention that the defendants persisted in a course of treatment
known to be ineffective is a dispositive example. Jose-Nicolas points to evidence in the
record that the defendants implemented repetitive "patient teachings," elimination diets,
and a cycle of prescription medicines that did not improve his symptoms in spite of
multiple years of complaints that he was still in pain, rather than conducting the
ultrasound. Viewed in the light most favorable to Jose-Nicolas, his medical records and
IDOC grievances overwhelmingly indicate that the course of treatment being pursued
left him in extreme pain—pain about which he was both vocal and persistent in seeking
care. This includes repeated reports of severe pain and signs of distress not only to
Drs. Siddiqui and Trost, but to the medical staff they supervised, and records of
complaints and a grievance filed in between the first and second denial of his
ultrasound. The defendants contend both that the prescriptions did improve Jose-
Nicolas's condition and that he was not taking them appropriately, but Jose-Nicolas
disputes both of these contentions and even they were undisputed, it would not
necessarily indicate that they had not persisted in an ineffective course of treatment.

The defendants also contend that Jose-Nicolas is "ask[ing] this Court to find that the Doctors' treatment decisions were so out of bounds that they do not constitute medical judgments." Defs.' Motion at 6. But Jose-Nicolas has not moved for summary judgment on this claim and is asking this Court to do no such thing.

Though the factual disputes the Court has described are not the only genuine factual disputes that exist on Jose-Nicolas's claim, it is clear, at a minimum, that there are genuine disputes regarding whether the defendants "doggedly persisted in a course of treatment known to be ineffective, behavior that we have recognized as a violation of the Eight Amendment." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). As such, summary judgment is not warranted on this claim.

### B. Intentional infliction of emotional distress claim

The defendants have also moved for summary judgment on Jose-Nicolas's claim of intentional infliction of emotional distress (IIED). To prevail, they must establish that there are no genuine disputes of fact regarding whether (1) their conduct was extreme and outrageous, (2) they intended or knew that the conduct would inflict severe emotional distress, or (3) their conduct caused such distress. *See Smith v. Dovenmuehle Mortg., Inc.*, 859 F. Supp. 1138, 1143 (N.D. Ill. 1994); *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 269, 798 N.E.2d 75, 80 (2003).

The defendants contend that their conduct plainly fails to rise to the level of "extreme and outrageous" conduct that an IIED claim requires. "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 607 N.E.2d 201, 211

(1992)).  The Illinois Supreme Court has described qualifying conduct as that where "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  *Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498, 507 (1994).  In the defendants' view, their conduct could not satisfy these requirements or elicit such a strong response because they took various steps to treat and alleviate Jose-Nicolas's ailments in some capacity.

In making this argument, the defendants analogize this case to *Hardy v. Hardy*, No. 10 C 5921, 2013 WL 5325077 (N.D. Ill. Sept. 20, 2013).  In *Hardy*, the court dismissed the plaintiff inmate's IIED claim because the defendant doctor "treated Hardy in *some* capacity and took some steps to treat his medical ailments," and there was no evidence that the doctor had a personal dislike of the plaintiff, told other professionals to withhold treatment, or had an otherwise toxic relationship with the plaintiff.  *Id.* at *6.

Jose-Nicolas attempts to distinguish *Hardy* by saying the defendant in that case did not have "complete authority" over the plaintiff.  Though it is true that conduct may be characterized as extreme and outrageous where it "arises out of an abuse of a position or relationship in which the defendant has authority over the plaintiff," *Woods v. Clay*, 2002 WL 731682, at *3 (N.D. Ill. Apr. 23, 2002), that is not the only consideration. The defendant in *Hardy* had the same amount of authority and control over the plaintiff's care that the defendants had over Jose-Nicolas in this case.  The defendants were not directly monitoring Jose-Nicolas on a daily basis; he went through other channels in order to get to the defendants; and the defendants were not in control of his other movements or activities.  If the relationship between inmates and prison medical physicians, without more, made contested conduct "extreme and outrageous," all such deliberate indifference claims would also be IIED claims.  That is not the law.

16

Because the defendants did consistently provide some form of treatment to Jose-Nicolas, and because he points to no evidence of dislike, toxicity in their relationship, or other course of conduct that a reasonable jury could determine goes "beyond all possible bounds of decency," the defendants are entitled to summary judgment on this claim.

## C.    Negligence claim

Both parties have moved for summary judgment on Jose-Nicolas's negligence claim.  Jose-Nicolas contends that the undisputed facts prove by a preponderance of the evidence that the defendants were negligent and that he is entitled to judgment as a matter of law.  The defendants contend that Jose-Nicolas's negligence claim is procedurally defective because he did not comply with 735 ILCS 5/2-622(a) and that it is too late to remedy the error.  In the alternative, they contend that because they have moved to strike Dr. Roth's testimony, which is necessary to substantiate Jose-Nicolas's claim that the defendants breached the standard of care, Jose-Nicolas will have not testimony to prove that a breach occurred.  As an initial matter, the defendants' argument in the alternative is moot given that the Court has declined to strike the testimony of Dr. Roth.  Because the defendants' procedural argument is also without merit, and because there are disputes of material fact as to whether the defendants breached the standard of care, summary judgment is not warranted.

Generally, compliance with 735 ILCS 5/2-622(a) requires a plaintiff in a tort action to file a copy of the expert's report and an affidavit declaring specific statements to the complaint.  The defendants rely on the Seventh Circuit's decision in *Young v. United States*, 942 F.3d 349 (7th Cir. 2019), to contend that because Jose-Nicolas did not attach these documents before they filed their motion for summary judgment, his negligence claim is procedurally barred and should be dismissed.  This argument

misunderstands *Young*. In *Young*, having decided that the lack of report and affidavit was not grounds for granting a motion to dismiss for failure to state a claim, the court determined that "[b]y requesting summary judgment as an alternative to its motion to dismiss the complaint, the United States put Young on notice of the need for an affidavit and report." *Id.* at 352. The court then affirmed summary judgment in favor of the defendant because "in the ensuing six months [the plaintiff] did not try to comply" but rather simply argued he was not obligated to provide an expert affidavit and report.

As in *Young*, by moving for summary judgment and arguing that the claim should be dismissed for noncompliance with section 2-622(a), the defendants put Jose-Nicolas on notice of the need for the affidavit and report. Unlike the plaintiff in *Young*, Jose-Nicolas promptly complied. And even if *Young* were properly interpreted to require filing the affidavit and report on or before the summary judgment deadline, Jose-Nicolas's cross motion for summary judgment was due on December 18, 2023—the date on which he did file the affidavit and report. The Court is satisfied that Jose-Nicolas has complied with the requirements of 735 ILCs 5/2-622(a).

The Court next turns to the parties' contentions that they are entitled to summary judgment on the merits. Neither has met their burden. At a minimum, there are genuine factual disputes regarding the issues of breach and causation.

It is undisputed that the defendants owed a duty to Jose-Nicolas, and both sides have both offered expert testimony regarding the appropriate standard of care. There is consensus that part of that standard of care required the defendants to conduct a "differential diagnosis"—a combination of empiric treatment and diagnostic evaluation— to rule out and treat causes of Jose-Nicolas's symptoms. The parties dispute the extent

to which the defendants properly executed the "differential diagnosis" and complied with the standard of care. The defendants contend that the doctors did have a differential diagnosis plan, having ruled out H. Pylori and treating Jose-Nicolas for GERD based on some of the symptoms he presented. In their view, the treatment process was on-going, and they were continuing to eliminate causes of Jose-Nicolas's ailments. Jose-Nicolas contends that the doctors erred by testing him for H. Pylori a second time and that when his symptoms persisted, adherence to the standard of care required administration of an ultrasound. But although an ultrasound may be the most definitive form of testing for gallbladder complications, the record also indicates that it is not the only diagnostic option. These are disputes of material fact that are for a jury to decide.

Regarding causation, the defendants contend that Jose-Nicolas is unable to show causation on any of his claims. They summarize Jose-Nicolas's argument as a contention that "but for" the doctor's denial of an ultrasound and gallbladder removal, he would have had no or less pain. They contend that he cannot demonstrate causation because it's unclear that he had gallstones prior to 2019—over the period at issue some of his symptoms were typical of gallbladder issues but some were more indicative of GERD. They also argue that he can't prove causation because there is evidence that he continued to have pain after his gallbladder was removed. For his part, Jose-Nicolas argues both that an ultrasound in 2017 would have identified the gallbladder issue and his pain would have been resolved sooner, and that even if he is unable to prove gallstones were present in 2017, causation is satisfied because the defendants caused him prolonged harm and put him at higher risk of developing other severe illnesses.

The parties' arguments point to some of the genuine factual disputes relating to

causation that make this claim inappropriate for summary judgment.  For example, Jose-Nicolas had prolonged pain abdominal pain, but he also had a mix of atypical symptoms that result in a factual dispute regarding whether conducting the ultrasound earlier would have been beneficial or actually reduced his pain.  The evidence is such that a reasonable jury could find for either party.  Summary judgment is, therefore, not warranted.

**D.    Willful and wanton negligence claim**

The defendants contend that they are also entitled to summary judgment on Jose-Nicolas's "willful and wanton" negligence claim because that is not an independent tort recognized in Illinois.  They point to *McCoy v. Iberdrola Renewables*, in which the court stated that "[u]nder Illinois law, there is no separate and independent tort of willful and wanton conduct."  *McCoy v. Iberdrola Renewables, Inc.*, No. 11 C 592, 2013 WL 4027045, at *3 (N.D. Ill. Aug. 7, 2013).  That is accurate, *see Doe–3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 2012 IL 112479, ¶ 19, 973 N.E.2d 880, 887 (2012), but it is equally clear that "willful and wanton conduct is regarded as an aggravated form of negligence."  *Id*.  To obtain damages for this, a plaintiff must prove the elements of negligence and a "deliberate intention to harm or an utter indifference to or conscious regard for the welfare of the plaintiff."  *Id.*

Whether willful and wanton negligence is properly pled as an independent claim is of little import.  As the court stated in *McCoy*:

> While it is true that [the plaintiff] has pleaded his willful and wanton claim in a separate count, the claim is no more than a supplemental allegation of negligence.  In other words, [plaintiff's] willful and wanton count is a "claim[ ] in name only.  *See Dwyer v. Reeder*, No. 10 C 1194, 2011 U.S. Dist. LEXIS 56979, at *3 (N.D. Ill. May 25, 2011) (rejecting argument that pleading separate counts invalidated gross negligence, willful and wanton

and punitive damages claims and striking motion to dismiss under Rule
12(b)(6) as moot). [Defendant's] motion on this ground is therefore
denied.

*McCoy*, 2013 WL 4027045, at *4. The Court agrees and similarly declines to grant

summary judgment in defendants' favor on this claim.

To the extent the parties dispute the availability of punitive damages for this or

other claims, they may renew those arguments in a Rule 50 motion at trial.

### E.    Negligent infliction of emotional distress claim

Both parties have moved for summary judgment on Jose-Nicolas's claim for

negligent infliction of emotional distress (NIED). In Illinois, to establish a claim for NIED

a plaintiff must show "the traditional elements of negligence: duty, breach, causation,

and damages," *Scheihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 31, 77 N.E.3d 50

(2016), as well as "contemporaneous physical injury or impact." *Williams v. Schwarz*,

2018 WL 1961143, at *7 (N.D. Ill. Apr. 26, 2018).

The defendants contend that they are entitled to summary judgment because

Jose-Nicolas is unable to demonstrate contemporaneous physical injury or impact.

They argue that there is no evidence of any impact by the doctors' treatment and that

Jose-Nicolas claimed his symptoms improved multiple times. This does not entitle the

defendants to summary judgment. Jose-Nicolas contends that he suffered physical

injury or impact because denial of the ultrasound referral caused him unnecessarily

prolonged suffering in the form of abdominal pain, vomiting, and nausea postdating the

denial. The fact that he sometimes reported feeling better does not mean the course of

treatment caused no physical impact, and Jose-Nicolas's expert also testified that

gallbladder disease symptoms could be intermittent.

21

Nor is Jose-Nicolas entitled to summary judgment.  As stated previously, establishment of an NIED claim requires a plaintiff to show the traditional elements of negligence.  For the same reasons outlined in denying Jose-Nicolas's motion for summary judgment on his negligence claim, the Court also denies his motion for the NIED claim.

### Conclusion

For the foregoing reasons, the Court grants summary judgment in favor of the defendants on Jose-Nicolas's claim for intentional infliction of emotional distress claim but otherwise denies the parties' motions for summary judgment [dkt. nos. 98, 104, 127].  The Court also denies Jose-Nicolas's motion for oral argument [dkt. no. 125]. The case is set for a telephonic status hearing on July 8, 2024 at 9:00 AM for the purpose of setting a trial date and discussing the possibility of settlement.  The following call-in number will be used:  650-479-3207, access code 980-394-33.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  July 1, 2024